IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-00557-JLK-CBS

JOHANNA ETTER, and
ARTHUR ETTER,
    Plaintiffs,
v.

CHARLES KING BIBBY, JR., M.D.,
TIMOTHY CARTER MEILNER, M.D., and
DELTA COUNTY MEMORIAL HOSPITAL DISTRICT,
    Defendants.
_____

MEMORANDUM OPINION AND ORDER
_____

Magistrate Judge Craig B. Shaffer

    This civil action comes before the court on "Plaintiffs' Motion to Compel Documents from Defendant Delta County Memorial Hospital District" (filed June 22, 2011) (Doc. # 52). Pursuant to the Order of Reference dated August 2, 2011 (Doc. # 64) and the memorandum dated August 2, 2011 (Doc. # 65), this matter was referred to the Magistrate Judge. The court has reviewed the Motion, Defendant Delta County Memorial Hospital District's ("Delta Hospital") Response (filed July 20, 2011) (Doc. # 56), Plaintiffs' Reply (filed August 1, 2011) (Doc. # 63), the arguments presented at the hearing held on August 29, 2011, the entire case file, and the applicable law and is sufficiently advised in the premises.

I.    Statement of the Case

    Plaintiffs are the parents of Gabrielle Etter, who died on March 23, 2008, as a result of pneumonia and infection. (*See* "Stipulated Scheduling and Discovery Order" (Doc. # 37 at 1 of 14)). Two days before her death, on March 21, 2008, Plaintiff Johanna Etter took Gabrielle

to the North Folk Medical Clinic in Paonia, Colorado, because she had become quite ill.  *See Id.*  Early on the morning of March 22, 2008, Johanna Etter took Gabrielle to Delta Hospital emergency room.  (*See id.* at 1-2 of 14).  Gabrielle was discharged later the same day.  (*See id.* at 2 of 14).  On March 23, 2008, Gabrielle returned to Delta Hospital, was transferred to Children's Hospital in Denver by air flight, and died shortly after arrival.  (*See id.* at 2 of 14). Plaintiffs assert four claims: negligence against Defendant Dr. Bibby; (2) negligence against Delta Hospital based on deficient nursing care; (3) violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395(dd), by Delta Hospital; and (4) negligence against Defendant Dr. Meilner.  (*See* First Amended Complaint (Doc. # 2 at 5-10 of 11)).  This court has subject matter jurisdiction over the Third Claim pursuant to 28 U.S.C. § 1331 based on EMTALA, under which federal law creates a cause of action, and supplemental jurisdiction over the First, Second, and Fourth Claims pursuant to 28 U.S.C. § 1367.

In their Third Claim for violation of EMTALA, Plaintiffs allege that when Gabrielle was discharged from the emergency department on March 22, 2008, she had an emergency medical condition that the Hospital was required to screen for and stabilize before it discharged her.  (*See* Doc. # 2 at 6 of 11).  In Plaintiffs' First Set of Discovery Requests, Requests for Production of Documents, Plaintiffs requested that Delta Hospital produce the following documents:

    3. Produce any reports, files or reviews that refer or relate to Gabrielle Etter's care on March 22, 2008, including, but not limited to, any quality assurance reports, peer review reports and morbidity/mortality reports. . .

    7. Produce any and all reports or files relating to Dr. Bibby, including, but not limited to, credentialing files, peer review files, quality assurance reports, morbidity/mortality reports, hospital privileges, and any reports relating to the deaths of patients under his care.

(*See* Delta Hospital's "Responses to Plaintiff's First Set of Discovery Requests" (Exhibit B to Motion) (Doc. # 52-2) at 7-8 of 9).  Delta Hospital objected to Request Nos. 3 and 7.  (*See id.*).  The court has since approved the parties' stipulated Protective Order and Delta Hospital has produced documents from Dr. Bibby's credentialing file. (*See* Docs. # 47, Exhibit B to Response (Doc. # 56-2)).  Delta Hospital continues to object to the production of the peer review documents, as privileged pursuant to the Colorado Peer Review Act, C.R.S. § 12-36.5-101, *et. seq.*, and C.R.S. § 12-36.5-104.4(2)(b).  (*See* Response (Doc. # 56)).  Delta Hospital provided copies of the peer review documents in dispute under seal for the court's *in camera* review.  (*See* Docs. # 57, # 58).

II.     Analysis

A.      EMTALA

Plaintiffs assert one claim under EMTALA for failure to "afford the patient an appropriate screening in order to determine if she had a[n] emergency medical condition" and for discharging her "without first stabilizing her emergency condition."  (*See* Doc. # 2 at 8 of 11).  Plaintiffs also assert three negligence claims under Colorado law.

"Congress enacted EMTALA in 1986 to address the problem of hospitals 'dumping,' or refusing to treat, emergency room patients who did not have adequate medical insurance or who could not otherwise pay for medical services."  *Zinn v. Valley View Hosp.*, 2010 WL 301860 (E. D. Okla. 2010) (citing *Ingram v. Muskogee Regional Medical Center*, 235 F.3d 550, 551 (10th Cir. 2000)).  *See also Bryant v. John D. Archibold Memorial Hospital*, 2006 WL 1517074, at * 2 (M.D. Ga. 2006) ("The act was intended to protect patients by prohibiting hospitals from engaging in patient dumping, the practice of refusing to examine or treat

patients who came into the emergency room of the hospital but might be unable to pay.") (internal quotation marks and citation omitted); *Moses v. Providence Hospital and Medical Centers, Inc.*, 2007 WL 1806376, at * 1 (E.D. Mich. 2007) ("The EMTALA statute was passed by Congress to address the problem of patient dumping, a practice whereby hospitals either send a patient in need of medical care to another facility (most often a public hospital) or simply turn the patient away due to the patient's inability to pay.") (internal quotation marks and citation omitted). "Violations of EMTALA can be redressed under 42 U.S.C. § 1395dd(d)(2)(A), which grants a private right of action to '[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section.'" "EMTALA is not, however, a federal malpractice statute." *Id.* (citations omitted).

"A hospital governed by EMTALA is faced with two basic requirements." *Ingram*, 235 F.3d at 551. "First, the hospital must provide for an appropriate medical screening . . . to determine whether or not an emergency medical condition . . . exists.' " *Id.* (quoting 42 U.S.C. § 1395dd(a)). *See also Guzman-Ibarguen v. Sunrise Hospital and Medical Center*, 2011 WL 2149542, at * 9 (D. Nev. 2011) ("The EMTALA statute imposes two duties on hospital emergency rooms. The first duty is to screen a patient for an emergency medical condition, and if an emergency condition is found, the hospital has a duty to stabilize the patient before transferring him to another medical facility or discharging him.") (citation omitted). "A patient who presents at an emergency room for medical assistance must receive an examination to determine whether the patient suffers from an emergency medical condition that, without immediate medical attention, could reasonably be expected to place the patient's health in serious jeopardy or cause serious impairment to bodily functions or dysfunction of any organ or body part."). *Bennett v. Kent County Memorial Hospital*, 623 F.

Supp. 2d 246, 250-51 (D. R.I. 2009) (citing 42 U.S.C. § 1395dd(e)) (internal quotation marks omitted).

"Second, EMTALA also requires that '[i]f an individual at a hospital has an emergency medical condition which has not been stabilized . . ., the hospital may not transfer the individual unless' certain conditions are met." *Ingram*, 235 F.3d at 551 (quoting 42 U.S.C. § 1395dd(c)(1)).  The stabilization requirement of EMTALA provides in relevant part:

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either --
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1).  EMTALA defines transfer in relevant part as: "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital."  42 U.S.C. § 1395dd(e)(4).  "Subsection (c) delineates the standards for making an appropriate transfer and sets forth procedures for transferring patients who are not stabilized."  *Ingram*, 235 F.3d at 551 (quoting 42 U.S.C. § 1395dd(c)).

The Tenth Circuit has interpreted the phrase "appropriate medical screening" in the context of an EMTALA claim under section 1395dd(a) as "hospital-specific, varying with the specific circumstances of each provider," rejecting an interpretation that would impose a uniform or national standard to medical screening of emergency room patients.  *Zinn*, 2010 WL 301860, at * 3 (citing *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 522 (10th Cir. 1994)).  "We believe that a hospital defines which procedures are within its capabilities when it establishes a standard screening policy for patients entering the emergency room. . . Thus,

5

a hospital violates section 1395dd(a) when it does not follow its own standard procedures." *Repp*, 43 F.3d at 522. "Consequently, when evaluating an EMTALA claim under subsection 1395dd(a), the relevant inquiry is not whether the emergency room procedures were adequate, but only whether the hospital adhered to its own procedures." *Repp*, 43 F.3d at 522 (internal quotation marks and citation omitted). "A court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." *Repp*, 43 F.3d at 522 n. 4. *See also Moses*, 2007 WL 1806376, at * 1 ("[T]he measure is not the outcome of the examination, but whether or not the examination performed was considered standard procedure by the hospital.").

"Courts which have addressed the issue of what constitutes appropriate treatment of an emergency room patient agree that [a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Bennett*, 623 F. Supp. 2d at 251 (internal quotation marks and citation omitted). "The essence of an EMTALA claim is that the plaintiff-patient is treated differently from the way other similarly situated patients are treated." *Bennett*, 623 F. Supp. 2d at 251 (citation omitted). "[I]n order to succeed on an EMTALA claim against a hospital for failure to provide an appropriate medical screening, a plaintiff must show that the hospital in question treated him or her differently than other patients with similar conditions." *Bryant*, 2006 WL 1517074, at * 2 (citation omitted).

B.    Colorado's Peer Review Privilege

The Colorado Medical Board (CMB) is charged by the Colorado Professional Review

Act (CPRA), C.R.S. §§ 12-36.5-101 to -203, with protecting "the people of this state from . . . unprofessional conduct by persons licensed to practice medicine. . . ." C.R.S. § 12-36.5-101. Colorado's General Assembly authorized the CMB to utilize and allow professional review committees to assist it in meeting its responsibilities. C.R.S. § 12-36.5-103(1). A professional review committee, the majority of whom must be licensed physicians, may be established by a licensed hospital to review and evaluate the quality and appropriateness of patient care provided by any licensed physician. C.R.S. §§ 12-36.5.104(1), (2) and (4)(a). In enacting the CPRA, the General Assembly's stated goals were to encourage physicians to engage in peer review and to provide immunity to the physicians that provide their services so that they may "exercise their professional knowledge" and judgment without undue fear of litigation. C.R.S. §§ 12-36.5-103(2), 12-36.5-103(3)(b). As part of the CPRA the Colorado General Assembly created a statutory privilege to ensure that peer review records would not be discoverable. *See* C.R.S. §12-36.5-104(10) ("The records of a professional review committee, a governing board, or the committee on anticompetitive conduct shall not be subject to subpoena or discovery and shall not be admissible in any civil suit brought against a physician who is the subject of such records.").

As required by its Medical Staff Bylaws and Medical Staff Rules and Regulations, Delta Hospital created clinical service committees to evaluate the quality and appropriateness of its physicians' care. (*See* Affidavit of Jeanine Finnell, Exhibit C to Response (Doc. # 56-3)). As a physician practicing in the Emergency Department, Dr. Bibby is evaluated by the Delta Hospital Emergency/Trauma Review Committee (ETSC). (*See id.*). The ETSC members identify cases for review and appoint an emergency service physician other than the physician involved in the care to review the case and report back to the ETSC. (*See id.*). Based on the report, the ETSC reaches a conclusion regarding the quality and

appropriateness of the care, makes a recommendation and develops an action plan for implementing the recommendation. (*See id.*). Plaintiffs seek production of the ETSC's peer reviews of Dr. Bibby.

C.     Production of Peer Review Materials

"Discovery in federal courts is generally governed by the Federal Rules of Civil Procedure regardless of whether federal jurisdiction is based on a federal question or diversity of citizenship." *Moses*, 2007 WL 1806376, at * 2 (citing *Atteberry v. Longmont United Hosp.*, 221 F.R.D. 644 (D. Colo. 2004); *Everitt v. Brezzel*, 750 F. Supp. 1063, 1065 (D. Colo. 1990). Fed. R. Civ. P 26(b)(1) broadly defines the scope of evidence that is subject to discovery.

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any **nonprivileged** matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P 26(b)(1) (emphasis added). Therefore, in order for information to be subject to discovery at all, it must be relevant or reasonably calculated to lead to relevant, admissible evidence.

"Where federal law provides the governing substantive law in a lawsuit, the federal common law of privileges will govern." *Moses*, 2007 WL 1806376, at * 2 (internal quotation marks and citation omitted). Rule 501 of the Federal Rules of Evidence provides that federal privilege law controls in cases proceeding under federal question jurisdiction.

Except as otherwise required by the Constitution of the United States or

8

> provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof, shall be determined in accordance with State law.

Fed. R. Evid. 501.

Here, federal law provides the rule of decision for the EMTALA claim but not the state law negligence claims. Plaintiffs argue that Delta Hospital's objection to production of the peer review documents is contrary to the federal law governing privileges, which applies when a plaintiff asserts a federal claim, as there is no applicable federal statutory or common law privilege to the requests at issue. Delta Hospital argues that the peer review documents are irrelevant to the EMTALA claim, the only federal claim in the case, and therefore federal law requires recognition of the state law privilege established in C.R.S. § 12-36.5-101 *et seq.* and 12-36.5-104.4(2)(b). The court perceives two issues regarding whether the peer review documents must be produced: (1) are they relevant to the subject matter, and (2) are they otherwise privileged?

    1.    Relevance

"[T]he key requirement of a hospital's duty under § 1359dd(a) [sic] is that a hospital apply its standard of screening uniformly to all emergency room patients, regardless of whether they are insured or can pay." *Gonzalez v. Choudary*, 2009 WL 1025543, at * 3 (D.N.J. 2009) (internal quotation marks and citations omitted). "A plaintiff must therefore present evidence that the hospital treated the plaintiff differently than any other patient who came to the emergency department with similar injuries and symptoms." *Gonzalez*, 2009 WL

9

1025543, at * 3. "In meeting this burden, a plaintiff may "look to sources other than the express standard policies of [the hospital] in attempting to show that the screening [the hospital] gave . . . was different than the screening it would have offered to other patients." *Gonzalez*, 2009 WL 1025543, at * 3. "Since a relevant inquiry to Plaintiff's EMTALA claim is whether Plaintiff was screened differently than other patients, . . . a discovery request seeking medical records of patients presenting to the emergency department with similar injuries and symptoms" may be appropriate under Fed. R. Civ. P. 26(b)(1). *Gonzalez*, 2009 WL 1025543, at * 3 (citing *Southard v. United Reg'l Health Care Sys., Inc.*, 245 F.R.D. 257, 260 (N.D. Tex. 2007) ("Necessarily, a comparison must be made between or among the symptoms presented by [the patient], the tests run and the diagnoses made as compared to other patients. . . .")).

   2.   Privilege

Rule 501 is not clearly instructive whether the federal courts should apply state law privileges when a single lawsuit presents claims arising under both federal and state law. The Advisory Committee's comments to Rule 501 provide that "federal law should not supersede that of the States in substantive areas such as privilege absent a compelling reason. The Committee believes that in civil cases in the federal courts where an element of a claim or defense is not grounded upon a federal question, there is no federal interest strong enough to justify departure from State policy."

"The Supreme Court has acknowledged that 'there is disagreement concerning the proper rule in cases . . . in which both federal and state claims are asserted in federal court and relevant evidence would be privileged under state law but not under federal law,' but it declined to decide the issue because it had not been raised and was not necessary for the

resolution of the case." *Bennett*, 623 F. Supp. 2d at 251 (quoting *Jaffee v. Redmond*, 518 U.S. 1, 17 n. 15 (1996)).  *See also Guzman v. Mem. Hermann Hosp. Sys.*, 2009 WL 427268 at *3 (S.D. Tex. Feb. 20, 2009) (acknowledging that issue of what privilege law should apply in federal question cases with supplemental state law claims remains unresolved).

"Neither the United States Supreme Court nor the Tenth Circuit Court of Appeals has recognized a medical peer review or medical risk management privilege under federal common law." *Atteberry*, 221 F.R.D. at 647 (citation omitted).  *See also Jenkins v. DeKalb County, Georgia*, 242 F.R.D. 652, 655 (N.D. Ga. 2007) ("The Supreme Court has never recognized a federal medical peer review privilege and there are no circuit court cases recognizing such a privilege.").  Nor has Congress created a federal privilege for peer review materials.  The Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101, *et seq.*, provided qualified immunity from suit to officials who conduct peer reviews, but did not protect documents created in the peer review process.  *See Atteberry*, 221 F.R.D. at 648 (noting that "[a]lthough presented with the opportunity to do so when enacting the federal Health Care Quality Improvement Act, the Congress failed to create an analogous federal privilege").  *See also Singh v. Pocono Medical Center*, 2010 WL 2521039, at * 3-4 (M.D. Pa. 2010) ("Although Congress has had two occasions to consider whether to extend the peer review privilege to materials produced by medical peer reviews: once in 1986, when the HCQIA was enacted, and again in 1987 when the statute was amended, Congress declined to do so on both occasions.").  Nevertheless, "all fifty states and the District of Columbia have recognized some form of medical peer review privilege."  *Virmani v. Novant Health Inc.*, 259 F.3d 284, 290 (4th Cir. 2001).  "[T]he decision to accord privileged status to peer review materials, in at least some states, appears to have been based on the policy decision that the interest in promoting candor among medical personnel outweighs the interest in providing

11

access to evidence in medical malpractice actions." *Id.* (citations omitted).  "[A] plaintiff's claim in a medical malpractice case arises from actions that occurred independently of the review proceedings." *Id.*  (citation omitted).

Federal courts have concluded that where medical peer review materials are relevant only to state law negligence claims and not to an EMTALA claim, state privilege law applies and peer review materials are privileged.  *See Bennett*, 623 F. Supp. 2d at 255 (peer review information sought by plaintiff was not relevant to EMTALA issue of disparate treatment).  "To preclude . . . the peer-review privilege in this case would jeopardize the confidentiality necessary for the peer-review process without assisting the plaintiff in prosecuting her EMTALA claim."  *Id.*  *See also Guzman-Ibarguen*, 2011 WL 2149542, at * 13 ("This Court agrees . . . that a federal district court should not refuse to apply state law privileges where the information sought is relevant only to a claim or defense to which state law supplies the rule of decision.");  *Guzman*, 2009 WL 427268, at * 9 ("[b]ecause the peer review documents are relevant only to the state-law negligence claims and not the federal EMTALA claim, state privilege law applies.").

Plaintiffs cite federal cases holding that federal privilege law applies even if the evidence sought is relevant only to supplemental state law claims.  The court finds these cases either distinguishable or unpersuasive.  In *Burrows v. Redbud Community Hospital District*, the plaintiffs brought EMTALA and pendent state law claims and sought discovery of peer review materials based on allegations that defendants conspired in peer review meetings to falsify and destroy the decedent's medical records.  187 F.R.D. 606, 610-11 (N.D. Cal. 1998). No part of the claims in the instant case arose out of the peer review meetings.  In *Smith v. Botsford General Hospital*, the court compelled production of an incident report prepared by an ambulance driver that was not generated during any peer

review process. No. 00-71549 (E.D. Mich. 2000) (Exhibit C to Motion (Doc. # 52-3)). Plaintiffs cite *Gianzero v. Wal-Mart Stores, Inc.*, 2011 WL 1740624 (D. Colo. 2011), and *Dataworks, LLC v. Commlog, LLC*, 2011 WL 66111 (D. Colo. 2011), in support of the general rule that federal privilege law applies even if the evidence sought is relevant only to supplemental state law claims. In *Gianzero*, the court denied a protective order, finding "medical evidence and records" generally relevant to the plaintiffs' claims under Fed. R. Civ. P. 26. 2011 WL 1740624, at * 4. In neither *Gianzero* nor *Dataworks* did the court analyze federal privilege law as it applies to peer review records. In *Atteberry*, the plaintiffs asserted an EMTALA claim against a hospital as well as negligence claims against the emergency department physician for discharging the plaintiff's son in an unstable condition. 221 F.R.D. 644, 646 (D. Colo. 2004). The plaintiff made the identical requests for production of documents as Plaintiffs did here.[1] The court determined generally that federal common law governed where the evidence sought may be relevant to state law claims that were supplemental to a federal EMTALA claim. *See id.* at 646–47. The court further concluded "[n]or is it clear that the state law privileges would apply to these facts," noting that there was no evidence that the records sought were related to a peer review process. *Id.* at 648.

Whether Gabrielle Etter received an appropriate screening examination and stabilizing treatment can be established from the medical records, Delta Hospital's policies and

---

[1] "The discovery at issue here involves requests for production seeking the following materials:
   1.   Any reports, files or reviews that refer or relate to Scott Atteberry's care on April 28, 2001, including, but not limited to any quality assurance reports, peer review reports and morbidity/mortality reports.
   7.   Any and all reports relating to Dr. Leonard, including, but not limited to, credentialing files, peer review files, quality assurance reports, morbidity/mortality reports, hospital privileges, and any reports relating to the deaths of patients under his care." *Atteberry*, 221 F.R.D. at 646.

procedures, and deposition testimony.  *See Guzman*, 2009 WL 427268, at * 9 (whether plaintiff and other emergency room patients exhibiting the same or similar symptoms were treated consistent with "emergency room policy can be determined by medical records, deposition testimony, and [hospital's] policies and procedures").  *See also Moses*, 2007 WL 1806376, at * 2 (applying state privilege law to medical peer review materials, as "[t]he sole issue in this EMTALA claim is whether Mr. Howard was diagnosed with an emergency medical condition, a fact which can be established from the medical records, . . .").[2]

The court finds that Plaintiffs' request for production of the peer review records of Gabrielle Etter and other patients presenting at the emergency department with similar symptoms and conditions may be relevant to the EMTALA claim.  The court is not persuaded that any additional peer review documents would be relevant to the subject matter of Plaintiffs' EMTALA claim.  The other peer review documents sought by Plaintiffs do not inform the query relevant to EMTALA liability, that is, how Delta Hospital treated other patients with similar symptoms.  Any additional peer review documents are not likely to lead to admissible evidence regarding the EMTALA claim, as "EMTALA does not guarantee that the hospital's emergency room personnel will correctly diagnose a patient's condition as a result of the emergency room screening."  *Moses*, 2007 WL 1806376, at * 3.  Failure to properly diagnose a medical condition cannot serve as the basis for a violation of EMTALA's requirements.  *Id.  See also Keitz v. Virginia*, 2011 WL 4737080, at * 4 (W.D. Va. 2011) ("the only relevant inquiry under EMTALA's stabilization requirement is whether [emergency room] personnel properly stabilized the condition from which they perceived the plaintiff as

---

[2]   Plaintiffs have disclosed an expert witness, Dr. Michael Jobin, who has already concluded without reviewing the peer review documents that Delta Hospital violated EMTALA. (*See* Exhibit A to Plaintiffs' Motion (Doc. # 52-1)).

suffering.") (citing *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996) ("On its face, [EMTALA's stabilization] provision takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect. . . . [EMTALA] does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware.") and *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir. 1992) (concluding that EMTALA's stabilization requirement is not triggered unless a hospital actually determines that a patient suffers from an emergency medical condition as this term is defined by the statute)).  Given the limited relevance the peer review materials have to Plaintiffs' EMTALA claim and Fed. R. Evid. 501's recognition of state law privilege when state law provides the rule of decision, the court determines that Plaintiffs are entitled to production of the peer review records limited to Gabrielle Etter and other patients presenting at the emergency department with similar symptoms and conditions.

   3.   *In Camera* Review

The court has reviewed *in camera* the tendered peer review documents that are responsive to Plaintiffs' Requests for Production of Documents Nos. 3 and 7.  In light of the analysis set forth above, the court determines that pages DCMHD – 0084, DCMHD – 0085, and DCMHD – 0098 (Docs. # 58-3 at 27, 28, and 41 of 56) are properly produced to Plaintiffs.

Accordingly, IT IS ORDERED that "Plaintiffs' Motion to Compel Documents from Defendant Delta County Memorial Hospital District" (filed June 22, 2011) (Doc. # 52) is GRANTED IN PART AND DENIED IN PART.  Pages DCMHD – 0084, DCMHD – 0085, and

DCMHD – 0098 (Docs. # 58-3 at 27, 28, and 41 of 56) are properly produced to Plaintiffs.  In all other respects, Plaintiffs' Motion is denied.

**Advisement to the Parties**

Within fourteen days after service of a copy of a Magistrate Judge's order, any party may serve and file written objections to the order.  Fed. R. Civ. P. 72(a).  "A judge of the court may reconsider any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A).  *See also* Fed. R. Civ. P. 72(a) ("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.").  Failure to make timely objections to the Magistrate Judge's order(s) may bar review by the District Judge and will result in a waiver of the right to appeal.  *See* Fed. R. Civ. P. 72(a) ("a party may not assign as error a defect in the order not timely objected to");  *S.E.C. v. Merrill Scott & Associates, Ltd.,* 600 F.3d 1262, 1269 (10th Cir. 2010) (failure to object to Magistrate Judge's order "strips us of jurisdiction to review the challenged order") (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997) ("[p]roperly filed objections resolved by the district court are a prerequisite to our review of a magistrate judge's order under 28 U.S.C. § 636(b)(1)(A)"));  *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1114 (10th Cir. 2004) ("If the parties fail to make timely objection, they 'waive[ ] appellate review of both factual and legal questions.' ") (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

DATED at Denver, Colorado, this 2nd day of November, 2011.

BY THE COURT:

  s/Craig B. Shaffer  
United States Magistrate Judge